The Fulton Bank *vs.* The New-York & Sharon Canal
Company and others.

By examining a defendant as a witness, the complainant precludes himself
from having any decree against such defendant personally; and the com-
plainant must pay costs to such defendant, although he might not have
been entitled to costs if the complainant had not examined him as a wit-
ness.

Where an officer of a corporation is necessarily made a defendant, for the
purposes of discovery merely, if the complainant is compelled to pay the
costs of such discovery, he may have a decree over against the other parties
for such costs.

An appeal from a final decree of a vice chancellor as to the general costs in
the cause may be made to the chancellor at any time within six months from
the time of entering the decree; but an appeal to the court for the correc-
tion of errors, from a decree of the chancellor as to such costs, must be
made within fifteen days after notice of the decree.

Where the complainant files a supplemental bill for the purpose of bringing
forward new matters which might have been introduced into the original
bill by way of amendment, the defendant should make his objection there-
to by demurrer, or by plea, or in his answer to the supplemental bill. And
it is too late to make such objection, for the first time, at the hearing.

An objection to the jurisdiction of the court on the ground that the complain-
ant has a perfect remedy at law should be made by demurrer, or in the an-
swer of the defendant. If the objection is made in the answer, the com-
plainant proceeds at the peril of costs if the objection is sustained at the
hearing.

The president of a corporation is not by virtue of his office authorized to
draw checks for the monies of the corporation deposited in a bank, unless
by the established usage of the place where the operations of the company
are carried on, the presidents of such corporations are in the practice of
drawing such checks without any special authority for that purpose.

Where, by the negligence of the directors or agents of a corporation, the
corporate funds were deposited in a bank in such a manner as to give the
officers of the bank reason to suppose the deposit was made by the presi-
dent of the corporation, who at the same time left his signature in the
bank as that upon which the money was to be drawn out; and the officers
of the bank afterwards paid out the money on his check, under a supposi-
tion that he had authority to draw for the same; *Held*, that the bank was
not liable for the loss sustained by the corporation from the misapplication
of such funds, by their president.

The directors or trustees of a corporation, when assembled as a board, are
the general agents of the corporation; and notice to them, when so assem-
bled, is notice to their successors and to the corporation. But notice to an

individual director, who has no duty to perform in relation to the subject matter of such notice, is not a good constructive notice to the corporation: Notice to the agent of a party is legal notice to the principal, where it is the duty of such agent to act upon the notice, or to communicate the information to his principal, in the proper discharge of his trust as such agent. And this rule applies to the agents of corporations as well as others.

Where there was a joint appeal by two defendants, and the decree was reversed as to one and affirmed as to the other, no costs were given in favor of either party on the appeal.

July 16.    THIS was an appeal from a decree of the vice chancellor of the third circuit.. The New-York and Sharon Canal Company was incorporated, by an act of the legislature of New-York, in April, 1823,. for the purpose of making a canal from the west bounds of the town of Sharon, in the state of Connecticut, to the tide waters of the Hudson, or to the city of New-York; the concerns of the company to be managed by 21 directors, who were to elect one of their number as president. In the month of May, 1823, a similar company was incorporated by the legislature of Connecticut, for the purpose of extending the canal into the town of Sharon in that state. The first directors were named in each act of incorporation, and were the same persons; and at a regular meeting of such persons, acting as directors of each company, they resolved that the stock of both companies, including the banking privileges which had been granted by the legislature of Connecticut, be considered consolidated stock, and that the companies should be considered as united for all the purposes mentioned in their acts of incorporation, and jointly liable for the debts or liabilities of either. Thereupon a committee was appointed to open books of subscription, and to receive five per cent. or five dollars on each share of the said stock which should be subscribed. On the sixth of September, 1825, an election of directors was held by the stockholders who had then become subscribers; at which election George W. Brown, Thomas Hyatt, Matthew Reed, Robert Cheesebrough, Joel Benton, Cyrus Swan, and fifteen others, were chosen directors. On the day following, a meeting of the directors was held, at which the six persons above named and eleven others were present. At that meeting, Brown was chosen president of each company; and he, together with Swan,

1833.

Fulton Bank
v.
N. Y. & Sha-
ron Canal Co.

Benton, Reed, Cheesebrough and Hyatt, were appointed a finance committee. And the joint funds of the companies were, by a resolution of the board, placed under the control of that committee ; which was also authorized to liquidate and pay the claims against the companies. The commissioners who had received subscriptions for the stock were also requested to pay over the funds in their hands to such committee, which was authorized to give receipts for the same. At a meeting of the finance committee, at the house of the president, the same evening, the commissioners paid over the money and checks in their hands, and the secretary of the companies, who was present, gave receipts therefor. A part of the funds consisted of monies received of the country subscribers, and the residue was in checks received from Brown and others, subscribers in the city of New-York. And it was then agreed that the monies of the companies, amounting to about the sum of $22,000, should be deposited in the Fulton Bank to the credit of the companies. The money was accordingly placed in the hands of Cox, the secretary, for that purpose. On the following day, Cox sent the money to the bank, either by the porter of the Tradesmen's Bank, of which he was teller, or by some other person not now recollected by him. The money was actually deposited in the bank of the complainants, and credited to the New-York and Sharon Canal Company ; and George W. Brown was then present in the bank, and left his signature in the signature book, *Geo. W. Brown, pres't*, as the signature to the checks on which the money was to be drawn out. Twenty thousand dollars of the money was drawn from the bank the same day, on checks signed by Brown, in that manner, and nearly all of the residue was drawn in the same way within two days thereafter. In July, 1826, Brown became insolvent ; by which the whole funds of the company, so drawn by him from the bank, were lost. The companies afterwards brought a suit at law against the complainants to recover the monies thus deposited in their bank ; whereupon the original bill in this cause was filed, for a perpetual injunction to restrain them from proceeding at law. And M. Reed and G W. Brown were also made defend-

ants. The bill charged, in substance, that the money was drawn out by Brown, as president of the companies, with the consent of the directors, and was invested in stocks or otherwise loaned on interest for the benefit of the companies. The answer of the companies denied the authority of Brown to draw out the monies ; but insisted, on the contrary, that the money was deposited in the bank, under an agreement of the finance committee of the companies, with Brown as a director and Cheesebrough as president of the bank, that it should be deposited in the bank, upon interest, and remain there subject only to be drawn out by the finance committee. A supplemental bill was afterwards filed, containing some further allegations in relation to matters which occurred before the filing of the original bill, to which the defendants put in an answer. Replications were filed to the answers of all the defendants, and the cause was heard on pleadings and proofs. The vice chancellor decreed a perpetual injunction against the prosecution of the suit by the canal companies against the complainants, upon their paying into court the sum of $19,59, standing to the credit of the companies upon the books of the bank, and decreed costs against the companies. He also directed the bill to be dismissed as to the defendants Reed and Brown, without costs. From this decision the defendants, except G. W. Brown, appealed to the chancellor.

*D. B. Ogden & J. Hoyt*, for the complainants.

*S. P. Staples & D. Lord, jun.* for the appellants.

THE CHANCELLOR. Although there is a general prayer for relief against the defendant M. Reed, the bill shows no ground of suit against him which could entitle the complainants to a decree. Besides, they precluded themselves from having any decree against him, by examining him as a witness in the cause. (*Per Ld. Eldon*, 3 *Dow's Rep.* 150.) And in such cases, the complainant must pay costs to the defendant examined, although he would not have been entitled to such costs if he had not been thus examined. (*Har-*

bey v. *Tebbut*, 1 *Jac. & Walk.* 203.) In this case, Reed was made a defendant, for the purpose of discovery merely, as one of the former officers of these canal companies. He was therefore, upon the general principles of the court in relation to bills of discovery, entitled to costs for putting in his answer; though the complainant, in such a case, may sometimes be entitled to a decree over against the corporation for the costs necessarily paid to their officer, who has been made a defendant for the sake of a discovery only. (*See Waymouth* v. *Boyer*, 1 *Ves. jun* 426.) The complainants in this case having prayed relief against Reed, and unnecessarily subjected him to the expense of a hearing upon pleadings and proofs, they ought to pay his whole costs, and should not be allowed to recover over against the canal companies for such unnecessary costs. Upon the hearing of this appeal, I was under the impression that the statute, limiting the right to appeal from a final decree as to the general costs in a cause to fifteen days, extended to the case of an appeal from a vice chancellor to the chancellor. I find, however, upon examination of the revised statutes, that the 79th section of the title relative to writs of error and appeals, (2 *R. S.* 695,) applies only to appeals from the court of chancery to the court for the correction of errors. And that by a previous provision, the appellant has six months, from the time of entering any final decree of a vice chancellor, to appeal therefrom to the chancellor. (2 *R. S.* 178, § 59.) The decree of the vice chancellor, refusing costs to the defendant Reed, must be reversed, and the complainants must pay to him his costs of this suit to be taxed; not including, however, any costs on this appeal. But as the counsel were stopped, upon the argument of the question of costs as to the defendant Reed, under the supposition that the appeal was not in time, they may re-argue the cause as to this point, if they think proper, at any time within one month after this decision.

The supplemental bill appears to have been unnecessarily and improperly filed, as it brings forward no new matter except such as had arisen before the commencement of the suit, and which therefore should have been introduced into the original bill by way of amendment. (*Stafford* v. *Howlett &*

1833.

Fulton Bank
v.
N. Y. & Sharon Canal Co.

*West,* 1 *Paige's Rep.* 200.) But as the mode of getting the new matters before the court was a matter of form merely, the defendants, if they wished to object to the form, should have demurred to the supplemental bill, or have made the objection by plea, or in their answer, that it brought forward no new matters, except such as could have been introduced into the original bill, by amendment, in that stage of the cause. And it is too late to make such a formal objection for the first time at the hearing, with a view to have the supplemental bill dismissed.

The same answer must be given to the objection to the jurisdiction of this court, on the ground that the complainants, if the allegations in the bill are true, had a perfect and available defence at law to the suit brought against them by the canal companies. If improper and untrue allegations are inserted in a bill, for the purpose of preventing a demurrer, and to give apparent jurisdiction to a court of equity, the defendant may, by his answer, deny those allegations, and insist that as to the other matters the complainant has a remedy at law. Although such an objection, in an answer, will not save the necessity of a full discovery as to all the matters charged in the bill, it will, at the hearing, be sufficient to prevent the complainant from obtaining his relief in this court. The court of chancery is constantly burthened with the investigation of facts, upon written depositions and at great expense, when from the face of the bill itself, or from the testimony in the case, it is perfectly evident that the complainant's appropriate remedy was in a court of law, and not in this court. But if the defendant will not make his objection in season, he must be subjected to the extra expense of a litigation here. Where the objection is made in the answer, the complainant proceeds at the peril of costs, if that objection is sustained at the hearing. In this case there is no doubt that it would have been a perfect defence to the suit at law, if the complainants had established the fact that the money was drawn from the bank by authority of the canal companies, or that the companies had subsequently sanctioned the act, as alleged by the complainants in their bill. But as the question of jurisdiction was not raised until after the testimony had been taken

in this court, the cause must now be disposed of upon the merits of the claim for which the suit at law was instituted.(a)

The canal companies are not entitled to recover on the ground of any special agreement, made with Cheesebrough as president and Brown as a director of the Fulton Bank, to receive the money in deposit and to pay interest therefor. I have no doubt, from the testimony in the cause, that such an agreement was actually made by them. Although Cheesebrough merely gave a tacit assent to the agreement made by Brown, in his name and in his presence, yet if he had been authorized as president of the bank to make such an agreement, it would have been as binding upon the complainants as if the same had been made by him personally. But it was no part of the ordinary business of banking to receive deposits of money on interest; and the president of the bank had no right to make such an agreement without some special authority from the board of directors. Neither is there any evidence here that Cheesebrough or Brown had any such special authority, or that any custom or practice existed in the banks of New-York from which such an authority can be inferred. The only use, therefore, which the defendants are authorized to make of the agreement, is to show that the president of the bank was apprised of the fact that it was not the intention either of the directors of the canal companies, or of their finance committee, that the monies should be immediately drawn out of the bank upon the checks of Brown. And if he was aware of the intention of Brown thus to obtain possession of the funds of the canal companies, he was a participator in the fraud, and rendered himself liable, either to the bank for a violation of his duty as president, or to the canal companies in his character of director and as a member of the finance committee. He was undoubtedly aware of the fact that stock had been subscribed in his name, and that he had been elected a director and a member of the finance committee. It appears by the minutes of the proceedings of the companies that he was present at a meeting of the directors on the seventh of September, 1825, when he was appointed a member of the finance committee; and he was present at a meeting of the

(a) See *Grandin* v. *Le Roy & Smith*, (2 *Paige's Rep.* 509;) and *Rees* v. *Smith*, (1 *Hammond's Ohio Rep.* 127.)

committee at Brown's the same evening. And there is no pretence that on either of those occasions he made the objection that he was not a stockholder, or that he declined serving as a director and member of the committee. It is therefore too late for him to say the stock was subscribed in his name without his assent, and that he mentally declined the acceptance of the trusts which had been conferred on him by the stockholders and the board of directors. No positive act of acceptance was necessary, other than being present at a meeting of the directors, or of the committee, and permitting the other members to suppose he was acting with them. If he meant to decline the appointment, he should have informed them of such declension.

Without taking up time to refer at length to the testimony upon which the opinion is founded, I have arrived at the conclusion that the directors of the companies never intended to put their corporate funds under the control of Brown as president. Neither did the finance committee leave the funds in his hands, or authorize him to draw the same from the bank, either for the purposes of speculation or otherwise; but that the money was drawn from the bank improperly and fraudulently, so far as relates to any actual or intended authority from the companies or their authorized agents. I am also satisfied that they have done no act, subsequent to the withdrawal of the money, which can be considered as sanctioning the acts of Brown in withdrawing the money from the bank, or his subsequent misappropriation thereof. The cause must then turn upon the question whether the agents of the companies have so negligently conducted themselves in making this deposit as to justify the officers of the bank in paying out the money on the checks of Brown, under the supposition, on their part, that he was authorized to draw for the same.

It is insisted on the part of the complainants that Brown, by virtue of his general powers as president of these companies, had a right to draw upon the bank for any funds standing upon their books to the credit of the companies, or of either of them. There is certainly nothing in the acts of incorporation giving the president any greater control over the property or funds of the companies than is given to any other

1833.

Fulton Bank
v.
N. Y. & Sha-
ron Canal Co.

director. He therefore was not authorized to draw checks for monies, deposited in the name of the companies, by virtue of his office of president merely ; unless by the established usage of the place where the operations of the companies were to be carried on, the president, ex officio, and without any special authority, exercised that power. I do not think the evidence in this case establishes any such general usage, even as to the presidents of banks and other monied corporations. But certainly there can be no pretence that there was any such general usage in relation to the presiding officers of canal companies at the time these checks were drawn. The officers of the bank had therefore no right to presume, from the mere fact of Brown's official station in these companies, that he was authorized to manage and control the monies deposited in the bank, to the credit of the companies.

It is proved, however, that it was the custom of the banks in New-York, upon the opening a new account on a deposit in the bank, whether by a corporation or otherwise, for the person making the deposit or who was to draw the money, to leave his signature in the signature book, and that all payments were made upon checks with such signature. In this case it is left doubtful, by the testimony, whether the money was carried to the bank by Brown, or by some other person ; though the probability is it was sent by Brown. I do not think, however, it is at all material whether the money was actually carried there by him or not ; as there can be no doubt that he was there at the time the deposit was made, and gave directions as to the mode in which it was to be drawn out, in such a manner as to induce the officers of the bank to suppose he had the control of the fund. And as no objection was made by the person depositing the fund, and no certificate was required showing that the money was actually deposited by Mr. Cox as the secretary of the company, the deposit, for the purpose of settling the rights of the parties in this suit, must be considered to have been made by Brown, or under his direction. If, by the negligence of those who had the fund in their possession, it has been deposited in such a manner as to give the officers of the bank reason to suppose the deposit was made by Brown in his character of president, the canal com-

panies must sustain the loss which has been occasioned by such negligence.    The case of *Dacy* v. *The New-York Chemical Manufacturing Company,* (2 *Hall's Super. Court Rep.* 550,) proceeds upon the same principle, and was correctly decided. In that case the husband had entrusted his wife with the money, to be deposited in the bank, and she deposited it in her own name, without informing the bank she was a feme covert.    She afterwards drew out the money upon her own checks, signed in the form agreed upon at the time of the deposit; and it was held the husband could not recover.    (*See also Barrett* v. *Deere,* 1 *Mood. & Malk. Rep.* 200.) If Mr. Cox had taken the precaution to require a certificate that he had deposited the money, and that it was under the direction of the finance committee, or if he had put such a memorandum on the package, or had given that information to the officers of the bank at the time the deposit was made, they would at their peril have paid it to any one not having actual authority from the finance committee, or the board of directors, to receive it.    Hence it becomes necessary to inquire whether the complainants are chargeable with notice that Brown had no right to draw the money from the bank, although he left his signature in the book kept for that purpose.    If the complainants are chargeable with such notice, the payments were made in their own wrong; and the canal companies are entitled to recover the monies from the bank, notwithstanding the payments to Brown; so far at least as the monies have not been actually applied to the use of those companies.    There can be no actual notice to a corporation aggregate, except through its agents or officers.    The directors or trustees, when assembled as a board, are the general agents, upon whom a notice may be served; and which will be binding upon their successors and the corporation.    But notice to an individual director, who has no duty to perform in relation to such notice, cannot be considered a notice to the corporation.    The notice which Brown and Cheesebrough had of what took place at the house of the former, on the evening of the 7th of September, was not of itself legal notice to the bank that the fund was placed under the control of the finance committee; and that Brown, although he left his signature, and apparent-

ly had the control of the money the next morning, was not in fact authorized to draw it from the bank. But if Cheesebrough had been authorized by the bank, as their president and agent, to agree to receive the money on deposit, the agreement made with him, as such agent, would have been notice to the corporation ; although he neglected to communicate the facts to the other officers of the bank, or to the board of directors. It is well settled that notice to an agent of a party, whose duty it is, as such agent, to act upon the notice, or to communicate the information to his principal, in the proper discharge of his trust as such agent, is legal notice to the principal. And this rule applies to the agents of corporations as well as others. From what took place on the evening of the seventh of September, Cheesebrough knew that this fund was placed under the control of the finance committee, and that Brown, as president of the canal companies, had no right to draw it out of the bank. But as there was nothing said or done at that time to excite a suspicion that Brown would attempt to practice a fraud, either upon the complainants or the canal companies, by attempting to draw the money from the bank without authority, it was not necessary for Cheesebrough to communicate that information to the tellers or other officers of the bank ; unless it became his duty to act, in his capacity of president, in relation to such deposit, from the fact of his knowing that Brown was about to withdraw the same wrongfully. It appears by the testimony, that in virtue of his office of president, he had a general superintending control over the clerks, tellers and other officers of the bank. It was his duty, therefore, to forbid their paying any check which he knew to be drawn improperly, and without authority. And if he should neglect to discharge such a duty, he would be personally liable to the institution for his improper conduct. If therefore Cheesebrough was present in the bank when the money was deposited, and knew that Brown had left his signature, as being authorized to draw out the money in 'his own name as president, it was his duty to give notice to the tellers and clerks of the facts which had

1833.

Fulton Bank
v.
N. Y. & Sharon Canal Co.

1833.

Fulton Bank
v.
N. Y. & Sha-
ron Canal Co.

come to his knowledge the evening before, and to forbid them from paying out the money, without the concurrence of the finance committee, or the order of the directors of the canal companies. And if I was satisfied that Cheesebrough was present and knew what took place in the bank at that time, or was informed thereof previous to the actual payment of the money to Brown, I should have no hesitation in saying that the complainants were chargeable with notice of the intended fraud, and that they were bound to pay the money a second time.

It seemed to be conceded, on the argument, by one of the counsel for the complainants, that the president of the bank was present on the morning of the 8th of September, and was aware that Brown had left his signature as president of the canal companies, and was about to commit a fraud, upon one party or the other by abstracting the money from the bank without authority. I did not, however, understand the counsel as admitting the existence of the fact, independent of what he supposed was established by the proofs. I have therefore been obliged to look into the depositions, to see whether there was any thing authorizing the court to draw such a conclusion, as against his clients. Cheesebrough was examined as a witness by the adverse party, and swore that he did not see Brown leave his signature in the signature book; and that he did not recollect being in the bank when the deposit was made, or of seeing Brown there. As Cheesebrough, from what had taken place the evening before, knew that Brown had no right to draw out the money, if he was present and cognizant of what was going on the next morning, he knew Brown was committing a fraud upon the bank or the canal companies; and this of itself would make such an impression on the mind that it could not easily have been forgotten. I must therefore conclude that Cheesebrough was not present and knowing to these transactions, or that he has committed corrupt perjury, by a wilful suppression of the truth. He also swears positively that he did not know that those funds had been withdrawn, previous to his leaving the institution; which was more than nine months afterwards. It is true, this part

1833.

Fulton Bank
v.
N. Y. & Sha-
ron Canal Co.

of the deposition is contradicted by Clinch, who swears he had a conversation with Cheesebrough on the subject while he was president of the bank. But that witness may possibly have been under a mistake as to the time when this conversation happened, as he refers to no circumstance to identify the time at which it took place. It also appears, by the exhibit No. 2, that a part of the funds were drawn from the bank as late as March, 1826 ; and it is hardly probable the cashier would have permitted that to be done, without further inquiry, if the objection to his right to draw had arisen previous to that time. Besides, it is not sufficient for the defendants to satisfy the court that their own witness cannot be relied on upon this point. If he says he has no recollection of the existence of a fact, they must satisfy the court by other testimony that the fact does exist. The impression of Oakley, who does not appear to have any distinct recollection on the subject, is not legal evidence of the fact. Indeed, if he supposed the whole transaction to be correct at the time, and if, as he says, it was according to the ordinary practice of the bank, there is no reason why he should, after such a lapse of time, be able to recollect who was present. The counsel who conducted the examination of the witnesses on this point, appear to have been engaged in establishing a fact against the interest of their respective clients. Although the defendants have not succeeded in convincing me that there was no reason to suspect the authorized agent of the complainants was aware of the intention of Brown to draw this money from the bank without authority, the complainants, on the other hand, have not established the fact of his knowledge of the intended fraud, in such a manner as to authorize me to make a decree against them upon the ground that the money was paid to Brown after they had legal notice that he was not authorized to receive the fund, and that he was about to commit a fraud, either upon the bank or the canal companies.

The decree of the vice chancellor, except as to the costs of Reed, must therefore be affirmed. But as this was a joint appeal, by Reed and the other defendants, and as I have not given costs in his favor, against the respondents, on the reversal of

that part of the decree which relates to him, I shall not give costs in favor of the respondents, against the other defendants, on the affirmance of the decree as to them.